Form 2

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT FILED

for the

Western District of Oklahoma

JUL 1 0 2026

JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____, DEPUTY

Case No. CIV-26-1747-SLP

*(to be filled in by the Clerk's Office)*

Dr. Diana Carole Awuor

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

Board of Regents of the University of Oklahoma

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

Jury Trial: *(check one)* ✔ Yes ☐ No

## COMPLAINT FOR A CIVIL CASE

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name                    Dr. Diana Carole Awuor
Street Address          833 SW 40th Street
City and County         Moore, Cleveland County
State and Zip Code      Oklahoma, 73160
Telephone Number        (346) 777-8897
E-mail Address          awuordiana2020@gmail.com

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

Name    The Board of Regents of the University of Oklahoma

Job or Title *(if known)*

Street Address    660 Parrington Oval, ~~Suite 213~~ Evans Hall, Room 119

City and County    Norman ; Cleveland County

State and Zip Code    Oklahoma 73160

Telephone Number    (405) 325-4122

E-mail Address *(if known)*    regents @ ou·edu

Defendant No. 2

Name

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Defendant No. 3

Name

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Defendant No. 4

Name

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question                    ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

    a.    If the plaintiff is an individual

       The plaintiff, *(name)* _____ , is a citizen of the State of *(name)* _____ .

    b.    If the plaintiff is a corporation

       The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ , and has its principal place of business in the State of *(name)* _____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

    a.    If the defendant is an individual

       The defendant, *(name)* _____ , is a citizen of the State of *(name)* _____ . Or is a citizen of *(foreign nation)* _____ .

    b.    If the defendant is a corporation

The defendant, *(name)* _____, is incorporated under

the laws of the State of *(name)* _____, and has its

principal place of business in the State of *(name)* _____.

Or is incorporated under the laws of *(foreign nation)* _____,

and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

_____

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

See attached complaint and Jury Demand
_____

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

*See attached complaint and Jury Demand, Prayer for Relief*

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    July 10, 2026

Signature of Plaintiff

Printed Name of Plaintiff    Dr. Dunna Carole Amoy

### B.    For Attorneys

Date of signing:    _____

Signature of Attorney    _____

Printed Name of Attorney    _____

Bar Number    _____

Name of Law Firm    _____

Street Address    _____

State and Zip Code    _____

Telephone Number    _____

E-mail Address    _____

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

DR. DIANA C. AWUOR,

Plaintiff,

v.

THE BOARD OF REGENTS OF THE UNIVERSITY OF OKLAHOMA,

Defendant.

Case No. _____

COMPLAINT AND JURY DEMAND

Plaintiff **Dr. Diana C. Awuor**, proceeding **pro se**, files this Complaint against Defendant **The Board of Regents of the University of Oklahoma** and alleges as follows:

## I. INTRODUCTION

1. This is an action for race discrimination, disability discrimination, failure to provide reasonable accommodations, retaliation, and hostile work environment arising from Plaintiff's employment with the University of Oklahoma.
2. Plaintiff brings this action pursuant to **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. § 2000e et seq., and the **Americans with Disabilities Act**, 42 U.S.C. § 12101 et seq.
3. Plaintiff is a Black African woman, a Kenyan immigrant, and an employee with disabilities who was hired by the University of Oklahoma as Assistant Director of Student Support within the Accessibility and Disability Resource Center.
4. Plaintiff alleges that, following a change in departmental leadership, Defendant subjected her to a continuing pattern of disparate treatment that included exclusion from leadership responsibilities, removal of significant job duties, undermining of her supervisory authority, heightened scrutiny, disability-related interference with the accommodation process, adverse employment actions, and retaliation.
5. Plaintiff further alleges that after engaging in protected activity by reporting discrimination, requesting reasonable accommodations, participating in the interactive process, filing internal complaints, and pursuing administrative remedies through the Equal Employment Opportunity Commission ("EEOC"), Defendant intensified its retaliatory conduct.
6. Plaintiff seeks all relief available under Title VII, the Americans with Disabilities Act, and applicable federal law.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.
8. This Court also has jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3) and 42 U.S.C. § 12117.
9. Venue is proper in the Western District of Oklahoma because the events giving rise to this action occurred within this judicial district, and Defendant employed Plaintiff in this district.

## III. PARTIES

10. Plaintiff, Dr. Diana C. Awuor, is an individual residing in Norman, Oklahoma.
11. Plaintiff began employment with the University of Oklahoma on or about January 2, 2024.
12. Plaintiff was hired as Assistant Director of Student Support in the Accessibility and Disability Resource Center ("ADRC").
13. Plaintiff was later reclassified as Accessibility Specialist, Lead, after Defendant removed her Assistant Director position and supervisory responsibilities.
14. Defendant, The Board of Regents of the University of Oklahoma, is the governing body responsible for the University of Oklahoma and was Plaintiff's employer at all relevant times.
15. At all relevant times, Defendant acted through its officers, supervisors, managers, Human Resources personnel, Institutional Equity personnel, administrators, and other employees acting within the course and scope of their employment.

## IV. ADMINISTRATIVE EXHAUSTION

16. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging race discrimination, disability discrimination, failure to accommodate, retaliation, and related unlawful employment practices.
17. Plaintiff fully exhausted her administrative remedies.
18. The EEOC issued Plaintiff a Notice of Right to Sue.
19. This action is timely filed within the statutory period following Plaintiff's receipt of the EEOC Notice of Right to Sue.
20. All conditions precedent to the filing of this action have been satisfied, performed, or have otherwise occurred.
21. The factual allegations set forth below are organized by subject matter and, where appropriate, presented in chronological order. Collectively, they describe the pattern of discrimination, failure to accommodate, retaliation, and hostile work environment giving rise to this action.

## V. FACTUAL ALLEGATIONS

### A. Plaintiff's Hiring and Original Role

22. Plaintiff began employment with the University of Oklahoma on or about January 2, 2024.

23. Plaintiff was hired as Assistant Director of Student Support in the Accessibility and Disability Resource Center.

24. Plaintiff was interviewed and selected for the position by then-Director Darcy Maelzer and Assistant Director Donna Lewis.

25. On Plaintiff's first day of employment, January 2, 2024, Plaintiff met with Darcy Maelzer and Donna Lewis as part of her orientation.

26. During that first-day meeting, Plaintiff was informed that she was the first Black employee in the department.

27. Plaintiff was also told about the department's history, including its previous location and historical context.

28. That first-day discussion later became important to Plaintiff because it gave context to her later statement that she was happy when another Black full-time employee joined the office.

29. Plaintiff's original Assistant Director role included leadership, supervision, coordination, student support, outreach, program development, collaboration with campus partners, and participation in accessibility-related initiatives.

30. Plaintiff's role required collaboration with faculty, staff, students, Housing, Testing Center, Admissions, Student Affairs, Human Resources, and other campus partners.

31. Plaintiff was expected to provide student support, assist with accommodation-related implementation, participate in policy and procedural discussions, and support campus-wide accessibility work.

32. Plaintiff also supervised staff in the ADRC.

33. Plaintiff performed leadership responsibilities and was part of departmental operations.

34. Plaintiff's work included outreach, survey development, event planning, faculty and staff communication, training, and collaboration with the Testing Center and other departments.

### B. Leadership Transition and Early Pattern of Exclusion

35. In or around late 2024, former ADRC Director Darcy Maelzer departed the department. Following her departure, Plaintiff and then-Assistant Director Donna Lewis were asked to serve as Interim Directors while the University determined the department's leadership structure.

36. Shortly thereafter, Donna Lewis commenced approved Family and Medical Leave (FMLA), leaving Plaintiff as the only on-site Interim Director responsible for the day-to-day leadership and operation of the Accessibility and Disability Resource Center until Dr. Lauren Sebel was appointed Interim Director.

37. Plaintiff performed these interim leadership responsibilities in addition to her regular Assistant Director duties. Plaintiff was instructed to record any overtime hours worked but was not offered or provided additional compensation for serving in the Interim

Director capacity. Plaintiff elected not to request overtime compensation because she considered the additional hours part of her commitment to the University; however, Plaintiff was never compensated separately for serving as Interim Director.

38. Dr. Sebel was not physically located on the Norman campus and worked remotely as a consultant.

39. Plaintiff alleges that after Dr. Sebel became Interim Director, Plaintiff's role changed in practice even before any formal reclassification occurred.

40. Plaintiff alleges that Dr. Sebel met with certain employees and began forming operational plans without Plaintiff's meaningful inclusion.

41. Plaintiff alleges that she was excluded from meetings, planning, and communications that reasonably fell within her Assistant Director responsibilities.

42. Plaintiff alleges that duties connected to her position were increasingly reassigned to white or non-Black employees, including employees who had reported to her.

43. Plaintiff alleges that, instead of being treated as an Assistant Director, she was increasingly treated as an employee whose work required unusual scrutiny and correction.

44. Plaintiff alleges that Dr. Sebel repeatedly instructed her to "focus inside," which Plaintiff understood as limiting her participation in external collaboration and outreach, even though those duties were part of her original role.

45. Plaintiff alleges that external collaboration was essential to student support and accessibility work.

46. Plaintiff alleges that her exclusion from campus partnerships and committee work undermined her ability to perform the job she was hired to do.

## C. Original Duties and Removal of Responsibilities

47. Plaintiff's Assistant Director role included duties related to outreach, assessment, program development, staff supervision, committee representation, and student support.

48. Plaintiff developed and supported surveys intended to assess ADRC services, faculty and staff awareness, and student experience.

49. Plaintiff alleges that survey work was consistent with her outreach and assessment responsibilities.

50. Plaintiff alleges that Dr. Sebel interfered with or blocked survey efforts without adequate explanation.

51. Plaintiff also participated in event planning and outreach.

52. Plaintiff alleges that successful events and outreach initiatives were later characterized negatively or minimized.

53. Plaintiff alleges that she proposed grant-related or funding-related ideas to support ADRC needs, including professional development, sign language interpreting costs, outreach materials, and other departmental priorities.

54. Plaintiff alleges that these proposals were dismissed or framed as distractions, even though resource development and outreach were related to her role.

55. Plaintiff alleges that certain duties were removed from her and reassigned to others.

56. Plaintiff alleges that Carol Kennedy, a white employee who previously reported to Plaintiff, was elevated into duties and opportunities that overlapped with Plaintiff's original Assistant Director responsibilities.

57. Plaintiff alleges that Megan Guffin, a white employee with a disability, was supported in professional duties and external-facing work while Plaintiff's own external work was restricted.

58. Plaintiff alleges that Carol Kennedy and Megan Guffin were given access, praise, flexibility, and opportunities that Plaintiff was denied.

59. Plaintiff alleges that she was held to a different standard than similarly situated non-Black employees.

D. First Protected Activity and Internal Complaints

60. Plaintiff began raising concerns internally regarding harassment, discrimination, and unequal treatment.

61. On or about March 3, 2025, Plaintiff contacted Human Resources to ask about the proper process for reporting workplace harassment.

62. Human Resources referred the matter to Jay Owens.

63. Jay Owens contacted Plaintiff regarding the matter.

64. Plaintiff later pursued internal reporting channels, including Human Resources and Institutional Equity.

65. Plaintiff also engaged the University Ombudsman.

66. Plaintiff alleges that these reports constituted protected activity.

67. Plaintiff alleges that after she raised concerns, the scrutiny of her work increased.

68. Plaintiff alleges that the timing of later discipline, restructuring, and additional adverse actions followed her protected activity.

E. Disability Disclosure and Accommodation Process

69. Plaintiff is an individual with disabilities within the meaning of the Americans with Disabilities Act.

70. Plaintiff has medical conditions that affect her functioning at work, including anxiety, panic-related symptoms, startle response, tachycardia, sensory sensitivity, and physical health conditions.

71. Plaintiff disclosed disability-related concerns to the University.

72. Plaintiff engaged Human Resources regarding reasonable accommodations.

73. Plaintiff requested accommodations related to communication, sensory triggers, workspace environment, work schedule, and hybrid work.

74. Plaintiff explained that constant sound notifications, sudden hallway movement, unexpected auditory interruptions, and office visibility demands affected her disability-related symptoms.

75. Plaintiff communicated that Microsoft Teams notifications could trigger sensory distress.

76. Plaintiff proposed reasonable alternatives, including email, phone calls, tagging her when her input was required, or direct communication.

77. Plaintiff also disclosed that arriving at 9:00 a.m. was related to health and functional limitations.

78. Plaintiff communicated with Vanessa Llach, the University's accommodations and leave administrator.

79. Plaintiff alleges that she participated in the interactive accommodation process in good faith.

80. Plaintiff alleges that Dr. Sebel knew Plaintiff was seeking accommodations.

81. Plaintiff alleges that, despite knowledge of the accommodation process, Dr. Sebel continued to cite accommodation-related issues as performance problems.

82. Plaintiff alleges that disability-related communication limitations were later used against her in discipline and performance criticism.

## F. Approved 9:00 a.m. to 6:00 p.m. Schedule

83. Plaintiff's 9:00 a.m. arrival schedule had been discussed with leadership and Human Resources.

84. On or about February 7, 2025, Plaintiff emailed Dr. Sebel and copied Dr. Belinda Hyppolite, stating that her schedule starting the following week would be 9:00 a.m. to 6:00 p.m.

85. Dr. Sebel replied, "Thank you, Dr. A - Enjoy your weekend!"

86. Plaintiff understood this as acknowledgment and non-objection to her schedule.

87. Plaintiff later was criticized in discipline for working a 9:00 a.m. to 6:00 p.m. or similar schedule.

88. Plaintiff alleges that Defendant later treated a known and acknowledged schedule as a performance issue.

89. Plaintiff alleges that this criticism was connected to disability-related scheduling needs and was used as part of a broader disciplinary narrative.

## G. Positive Discipline Issued After Protected Activity

90. On or about June 2, 2025, Plaintiff re-engaged or reopened her internal Equity complaint due to continued concerns.

91. On or about June 3, 2025, Plaintiff received Positive Discipline.

92. Plaintiff alleges that the June 3, 2025 discipline occurred shortly after protected activity.

93. Plaintiff alleges that the discipline included allegations that were inaccurate, unsupported, or based on matters for which she had not received prior coaching.

94. Plaintiff alleges that the discipline included criticism of her leadership, communication, time management, schedule, external collaboration, FERPA-related conduct, and other matters.

95. Plaintiff alleges that some issues included in the discipline related directly or indirectly to disability-related limitations or accommodation discussions.

96. Plaintiff alleges that the discipline placed her at heightened risk of further discipline and termination.

97. Plaintiff alleges that the discipline harmed her professional reputation, employment record, and emotional well-being.

## H. FERPA-Related Discipline and Comparator Evidence

98. Plaintiff alleges that one basis for discipline involved an accusation that she violated FERPA or disclosed confidential student information.

99. Plaintiff denies that she violated FERPA.

100. Plaintiff alleges that when contacted by Professor Eric Bosse about his daughter, Plaintiff responded carefully.

101. Plaintiff confirmed general process information and declined to disclose case-specific information because there was no release authorizing disclosure.

102. Plaintiff directed that the student should contact Plaintiff directly or schedule a meeting.

103. Plaintiff alleges that this response was consistent with protecting student privacy.

104. Plaintiff later identified a comparable situation involving Stacey McElhaney, who handled a parent or guardian inquiry.

105. Plaintiff brought that issue to Jennifer Murchison's attention and asked for FERPA clarification.

106. Jennifer Murchison responded by providing guidance about keeping communication general and being careful when speaking with parents.

107. Plaintiff alleges that Stacey was coached or guided rather than formally disciplined.

108. Plaintiff alleges that Plaintiff was disciplined for conduct she contends was FERPA-protective, while a comparable FERPA-related concern involving another employee was handled through clarification and coaching.

109. Plaintiff alleges this different treatment supports her claim that workplace concerns involving her were escalated more severely than comparable concerns involving others.

## I. Juan Tobon Comparator and Undermining of Supervisory Authority

110. Plaintiff supervised Juan Tobon Orrego during the relevant period.

111. Plaintiff alleges that Juan was permitted flexibility and leniency not afforded to Plaintiff.

112. Plaintiff alleges that Juan was permitted to work from other locations on campus, despite Plaintiff's supervisory concern about confidentiality and data access.

113. Plaintiff alleges that Dr. Sebel approved Juan's request to work from main campus after Plaintiff had stated that such permission had not been approved through her.

114. Plaintiff alleges this undermined Plaintiff's supervisory authority.

115. Plaintiff further alleges that Juan had an adult guest present in his office during work hours and during a staff meeting.

116. Plaintiff considered this a confidentiality concern because ADRC employees handle private student disability information.

117. Plaintiff reported the matter and addressed it with Juan.

118. Plaintiff issued or attempted to issue a verbal warning in her supervisory capacity.

119. Plaintiff alleges that leadership later decided the matter should be handled as a developmental conversation and that the documentation would not be placed in Juan's file.

120. Plaintiff alleges that this was materially different from how Defendant treated Plaintiff.

121. Plaintiff alleges that concerns involving Juan were handled developmentally, while concerns involving Plaintiff were escalated into formal written discipline.

122.    Plaintiff alleges that this difference supports her claim of disparate treatment and undermining of her leadership.

## J. Minor Children in Office and University Policy

123.    Plaintiff alleges that the discipline also referenced Plaintiff's minor children being present in her office.

124.    Plaintiff clarifies that her minor children were only present in her office with permission from then-Director Darcy Maelzer.

125.    Plaintiff alleges this occurred during Darcy Maelzer's tenure, not during Dr. Sebel's interim leadership.

126.    Plaintiff alleges that Darcy Maelzer herself occasionally brought her children to the office.

127.    Plaintiff alleges that she was not previously told that the approved presence of her children violated workplace expectations.

128.    Plaintiff alleges that the University's Minors on Campus Guidelines permit employees to bring minors to work occasionally with supervisory approval.

129.    Plaintiff alleges that her children's occasional presence with supervisory permission was materially different from an unauthorized adult guest being present during confidential staff operations.

130.    Plaintiff alleges that Defendant later used the approved children-in-office issue against her to justify formal discipline.

131.    Plaintiff alleges that this comparison was inaccurate, unfair, and pretextual.

## K. Testing Center Meetings and Dr. Watson

132.    Plaintiff's Assistant Director role involved collaboration with campus partners, including the OU Testing Center.

133.    The Testing Center plays an important role in implementing disability-related testing accommodations.

134.    Plaintiff alleges that Testing Center leadership requested recurring collaboration with her regarding accommodation processes.

135.    Plaintiff alleges that Kristen Dennis, Assistant Director of the Testing Center, requested regular meetings with Plaintiff.

136.    Plaintiff responded professionally and suggested biweekly meetings instead of weekly meetings.

137.    Plaintiff copied Dr. Deborah Watson and Dr. Lauren Sebel.

138.    Plaintiff alleges that this shows the proposed meetings were transparent and known to her supervisor.

139.    Plaintiff alleges that she was later criticized or disciplined for meeting with Dr. Watson or Testing Center personnel without permission.

140.    Plaintiff alleges that this criticism was inaccurate because the meetings were requested by Testing Center leadership, related to legitimate accommodation implementation, and communicated with Dr. Sebel copied.

141.    Plaintiff alleges that discipline related to Testing Center collaboration further shows that legitimate job-related duties were recast as misconduct.

## L. Walk-Ins, Door-Open Requirement, and Operational Alternatives

142. Plaintiff alleges that the ADRC had historically used structured walk-in processes.

143. Plaintiff alleges that walk-ins had previously been organized through systems that allowed staff to know when a student arrived.

144. Plaintiff alleges that students could scan a QR code or otherwise be directed through an organized process.

145. Plaintiff alleges that requiring Plaintiff's office door to remain open was not the only available way to provide student access.

146. Plaintiff developed or participated in proposals for Virtual Pop-Ins and structured walk-in alternatives.

147. Plaintiff proposed using Copeland as an alternative or backup location for in-person consultations.

148. Dr. Hyppolite supported Copeland being considered as a backup location.

149. Plaintiff alleges that operational alternatives were available, including virtual pop-ins, assigned walk-in coverage, QR code systems, alternative spaces, and structured scheduling.

150. Plaintiff alleges that despite these alternatives, Defendant later required Plaintiff's office door to remain open or visible in ways that aggravated her disability-related symptoms.

151. Plaintiff alleges that the door-open requirement intersected directly with her accommodation needs.

152. Plaintiff alleges that the University's insistence on office visibility and open-door arrangements contributed to heightened sensory exposure, startle response, anxiety, and medical distress.

153. Plaintiff alleges that this requirement was unnecessary because other operational methods could have maintained student access without aggravating her disability.

## M. Accommodation Escalation, Door Modification, and Remote Work

154. Plaintiff continued participating in the interactive accommodation process in 2026.

155. Plaintiff provided medical documentation supporting accommodations.

156. Plaintiff alleges that she experienced increased sensory and physical symptoms due to the workplace environment.

157. Plaintiff reported symptoms including heightened startle response, racing heartbeat, tachycardia, anxiety, difficulty eating and drinking adequately, nausea, and physical distress.

158. Plaintiff sought medical treatment during this period.

159. Human Resources later issued accommodation determinations or memoranda addressing workspace modifications.

160. Plaintiff was permitted to work with her office door closed pending installation of a glass panel.

161. A glass panel was later installed in Plaintiff's office door.

162.    Although the glass viewing panel increased visibility into Plaintiff's office, Defendant continued requiring Plaintiff to keep her office door open during designated walk-in hours, generally between approximately 11:30 a.m. and 1:30 p.m.

163.    After Plaintiff questioned what constituted the department's "high peak traffic" period, Defendant identified approximately 11:30 a.m. to 1:30 p.m. as the relevant timeframe and later communicated that schedule to department staff.

164.    Plaintiff alleges that, despite this designation, she did not observe the level of walk-in traffic that would require her office door to remain open and repeatedly informed Human Resources that the open-door requirement continued to expose her to the sensory triggers underlying her accommodation request.

165.    Plaintiff informed Human Resources that visitors to the Accessibility and Disability Resource Center typically first presented to the Administrative Assistant's office, which already displayed signage directing visitors where to go for assistance. Plaintiff provided Human Resources with photographs and video illustrating the existing visitor flow.

166.    After Plaintiff raised this concern, the department purchased and installed "Come In, I Can Help You" signs on individual office doors, including Plaintiff's office. Plaintiff alleges that this represented a change from the prior visitor process, in which visitors were generally directed through the Administrative Assistant before meeting with other staff.

167.    Plaintiff alleges that, despite the installation of the glass viewing panel and the additional office signage, Defendant continued requiring Plaintiff to keep her office door open during designated walk-in hours.

168.    Plaintiff alleges that she continued to experience disability-related sensory symptoms during the periods her office door was required to remain open.

169.    Plaintiff alleges that, following implementation of the open-door requirement, student interactions with her continued to occur primarily through scheduled appointments rather than unscheduled walk-ins.

## N. Accommodation Confidentiality Concern Involving Carol Kennedy

170.    Plaintiff alleges that Carol Kennedy told Plaintiff that Jennifer Murchison had made statements about Plaintiff's accommodation process.

171.    Plaintiff alleges that Carol stated this affected Carol's own willingness to seek accommodations.

172.    Plaintiff reported this concern to Jeri Packard in Human Resources.

173.    Plaintiff told Human Resources she had not authorized disclosure of information related to her accommodation process.

174.    Plaintiff requested review of the matter.

175.    Plaintiff alleges that the handling of this report contributed to her concern that disability-related information was not being properly protected.

## O. Staff Dispute and Dispute Resolution Process

176.    Plaintiff pursued the University's dispute resolution process.

177. Plaintiff was informed that an independent committee or neutral process would review the matter.

178. Plaintiff alleges that she was told she would be contacted regarding next steps.

179. Plaintiff alleges that she was never meaningfully interviewed by that committee before receiving notice that the discipline would stand.

180. Plaintiff alleges that the timeline of the dispute process raises concerns about whether the review was full, neutral, and complete.

181. On September 18, 2025, Jay Owens informed Plaintiff that her Staff Dispute remained under review and that he had not yet received any updates regarding the review process.

182. On September 21, 2025, after not receiving any further information regarding the review, Plaintiff submitted a formal complaint to Vice President and Chief Human Resources Officer Dorothy Anderson alleging discrimination, retaliation, and concerns regarding the handling of her dispute.

183. On September 22, 2025, Plaintiff received notice that the Staff Dispute review had been completed and that the Positive Discipline would stand.

184. Plaintiff alleges that, despite previously being informed that an independent review process would occur and that she would be contacted regarding next steps, she was never interviewed or asked to provide additional information before receiving the final decision.

185. Plaintiff alleges that the timing of these events raises questions regarding the completeness of the review process and whether her concerns were meaningfully considered before the final decision was issued.

186. Plaintiff submitted a grievance alleging race discrimination, disability discrimination, harassment, retaliation, and disparate treatment.

187. Plaintiff identified Dr. Lauren Sebel as a respondent.

188. Plaintiff identified comparators, witnesses, and supporting evidence.

189. Plaintiff alleged that she was being treated differently than non-Black employees, including Carol Kennedy, Megan Guffin, and Juan Tobon.

190. Plaintiff alleged that she had suffered emotional distress, health impacts, poor performance review, written discipline, and professional harm.

191. The University issued a Notice of Investigation and Allegations.

192. The Notice acknowledged allegations that Dr. Sebel restricted Plaintiff's ability to perform duties, excluded Plaintiff from tasks and meetings, assigned tasks to Plaintiff's subordinate, filed positive discipline accusing Plaintiff of insufficient productivity, and used matters connected to Plaintiff's accommodations as reasons for discipline.

193. Plaintiff alleges that the internal investigation failed to adequately address her evidence.

194. Plaintiff alleges that key witnesses were not interviewed.

195. Plaintiff alleges that the investigation did not fully analyze disability retaliation, ADA accommodation issues, comparator evidence, or the timing of protected activity and discipline.

P. Reclassification and Loss of Supervisory Duties

196.    Plaintiff alleges that Defendant later changed her classification and removed her supervisory duties.

197.    Plaintiff alleges that she was moved from Assistant Director of Student Support to Accessibility Specialist, Lead.

198.    Plaintiff alleges that the reclassification constituted a demotion in substance because it removed leadership, supervisory authority, and Assistant Director responsibilities.

199.    Plaintiff alleges that the reclassification followed protected activity and earlier discipline.

200.    Plaintiff alleges that Defendant described the change as restructuring, but the effect was to remove Plaintiff from leadership and reduce her authority.

201.    During the restructuring process, Plaintiff became aware that Carol Kennedy repeatedly stated that Dr. Lauren Sebel had created an Accessibility Specialist, Lead position for her.

202.    Plaintiff raised this issue directly with Jennifer Murchison during a one-on-one meeting and requested that Human Resources expedite clarification of the Accessibility Specialist, Lead position because of the uncertainty surrounding the role and its reported purpose.

203.    The following day, Human Resources representative Jeri Packard met individually with ADRC staff members regarding the restructuring. During Plaintiff's meeting, Plaintiff was informed that **she**, rather than Carol Kennedy, would be placed into the Accessibility Specialist, Lead position.

204.    Before the restructuring was implemented, Carol Kennedy had already begun coordinating significant portions of the SPIN program in collaboration with Dr. Lauren Sebel and Dr. Belinda Hyppolite. Plaintiff further alleges that SPIN coordination was later identified as a principal responsibility of the newly created Accessibility Specialist, Lead position.

205.    Plaintiff alleges that the sequence of these events—including Carol Kennedy's reported statements that the Accessibility Specialist, Lead position had been created for her, her involvement in developing and coordinating SPIN before the restructuring, and Plaintiff's subsequent reassignment into that position after raising concerns with leadership—supports Plaintiff's contention that the restructuring process was not implemented in a neutral manner.

Q. Additional Discipline and Heightened Scrutiny

206.    Plaintiff alleges that she later received additional discipline, including final written discipline.

207.    Plaintiff alleges that the discipline relied on issues connected to accommodation disputes, office visibility, communication expectations, attendance, and workplace conduct.

208.    Plaintiff alleges that Defendant scrutinized her attendance and communication more harshly than warranted.

209. Plaintiff alleges that Jennifer Murchison accused Plaintiff of not calling or leaving voicemail when Plaintiff had called the office and spoken with Stacey.

210. Plaintiff alleges that Plaintiff explained weather, poor visibility, heavy rain, and road or campus closure conditions when she was delayed.

211. Plaintiff alleges that she offered to work until 6:00 p.m. to make up a few minutes of time.

212. Plaintiff alleges that these events show heightened scrutiny and a search for disciplinary reasons.

213. Plaintiff alleges that this heightened scrutiny occurred after she engaged in protected activity and during ongoing accommodation disputes.

214. Plaintiff's 2025 annual performance review further documented that Plaintiff's Positive Discipline directly affected her compensation. The Merit Tier Justification prepared during the annual review stated that Plaintiff "received a positive discipline review in 2025 and was rewarded a tier 1 accordingly." Plaintiff alleges that because the Positive Discipline was discriminatory and retaliatory, it directly reduced her merit-based compensation and caused additional economic harm.

R. Harassing and Stereotyped Comments

215. Plaintiff alleges that she was subjected to comments and characterizations that invoked harmful stereotypes.

216. Plaintiff alleges that Dr. Sebel stated that Plaintiff looked angry or always looked angry.

217. Plaintiff alleges that Dr. Hyppolite also used or repeated the word "angry" in reference to Plaintiff.

218. Plaintiff alleges that she understood these comments as connected to racialized stereotypes about Black women.

219. Plaintiff alleges that she was criticized for her tone, facial expression, demeanor, and communication style in ways that were subjective and unsupported.

220. Plaintiff alleges that these comments and characterizations contributed to a hostile work environment and undermined her professional reputation.

S. Damages

221. Plaintiff has suffered emotional distress.

222. Plaintiff has suffered physical and medical impacts from stress and accommodation disputes.

223. Plaintiff has experienced anxiety, heightened startle response, tachycardia, difficulty eating, nausea, physical distress, and worsening health symptoms.

224. Plaintiff has incurred medical appointments and treatment related to the effects of workplace stress.

225. Plaintiff has suffered reputational harm.

226. Plaintiff has suffered harm to her career trajectory.

227. Plaintiff has suffered loss of leadership duties, loss of supervisory authority, and professional humiliation.

228. Plaintiff has suffered family harm.

229.    Plaintiff alleges that the workplace distress affected her household and contributed to her husband's decision to take early retirement from the military to support the family.

230.    Plaintiff has suffered fear of termination and ongoing employment insecurity.

231.    Plaintiff has suffered loss of enjoyment of life, stress, and emotional pain.

## VI. CLAIMS FOR RELIEF

### COUNT I
Race Discrimination and Disparate Treatment
Title VII of the Civil Rights Act of 1964

232.    Plaintiff incorporates all prior paragraphs as though fully set forth here.

233.    Plaintiff is a member of protected classes based on race, color, and national origin.

234.    Plaintiff is a Black African woman and Kenyan immigrant.

235.    Plaintiff was qualified for her position and satisfactorily performed its essential functions.

236.    Plaintiff performed her job duties and had the education, experience, and professional background required for the role.

237.    Plaintiff was subjected to adverse employment actions, including but not limited to formal discipline, removal of duties, loss of supervisory authority, exclusion from leadership work, negative evaluations or performance criticism, reclassification, and reputational harm.

238.    Plaintiff alleges that similarly situated non-Black employees were treated more favorably.

239.    Plaintiff alleges that non-Black employees received coaching, flexibility, developmental conversations, leadership opportunities, and protection from discipline, while Plaintiff was subjected to formal discipline and heightened scrutiny.

240.    Plaintiff alleges that Defendant's stated reasons for its actions were pretextual.

241.    Plaintiff alleges that race, color, and national origin were motivating factors in Defendant's treatment of her.

242.    Defendant's conduct violated Title VII.

### COUNT II
Disability Discrimination and Failure to Accommodate
Americans with Disabilities Act

243.    Plaintiff incorporates all prior paragraphs as though fully set forth here.

244.    Plaintiff is an individual with disabilities within the meaning of the ADA.

245.    Plaintiff was qualified to perform the essential functions of her job with or without reasonable accommodation.

246.    Plaintiff informed Defendant of her disability-related limitations.

247.    Plaintiff requested reasonable accommodations.

248.    Plaintiff engaged in the interactive process.

249.    Plaintiff provided or sought medical documentation.

250. Defendant knew or should have known of Plaintiff's need for accommodations.

251. Plaintiff requested accommodations related to schedule, communication, workspace environment, sensory triggers, office door/visibility, and remote work.

252. Plaintiff alleges that Defendant failed to provide reasonable accommodations in a timely and effective manner.

253. Plaintiff alleges that Defendant used disability-related symptoms or limitations as performance or conduct issues.

254. Plaintiff alleges that Defendant's handling of the accommodation process caused additional harm.

255. Plaintiff alleges that Defendant's conduct violated the ADA.

## COUNT III
## ADA Retaliation

256. Plaintiff incorporates all prior paragraphs as though fully set forth here.

257. Plaintiff engaged in protected activity under the ADA by disclosing disability-related limitations, requesting accommodations, communicating with Human Resources, submitting medical documentation, and objecting to disability-related treatment.

258. Defendant knew of Plaintiff's protected activity.

259. Plaintiff suffered adverse actions after engaging in protected activity.

260. These adverse actions included discipline, heightened scrutiny, removal of duties, office-related directives, accommodation-related disputes, reclassification, and other actions that would deter a reasonable employee from engaging in protected activity.

261. The timing and sequence of events support an inference of retaliation.

262. Plaintiff alleges that Defendant retaliated against her because she requested accommodations and asserted disability-related rights.

263. Defendant's conduct violated the ADA.

## COUNT IV
## Title VII Retaliation

264. Plaintiff incorporates all prior paragraphs as though fully set forth here.

265. Plaintiff engaged in protected activity under Title VII by reporting race discrimination, harassment, disparate treatment, and retaliation.

266. Plaintiff reported concerns to Human Resources, Institutional Equity, leadership, and external agencies.

267. Defendant knew of Plaintiff's protected activity.

268. Plaintiff was subjected to adverse actions after engaging in protected activity.

269. These adverse actions included discipline, removal of duties, negative treatment, heightened scrutiny, reclassification, loss of supervisory authority, and reputational harm.

270. Plaintiff alleges that the timing of the June 3, 2025 discipline shortly after protected activity supports an inference of retaliation.

271. Plaintiff alleges that additional adverse actions followed continuing protected activity.

272. Defendant's conduct violated Title VII.

COUNT V
Hostile Work Environment
Title VII and ADA

273. Plaintiff incorporates all prior paragraphs as though fully set forth here.

274. Plaintiff alleges that she was subjected to repeated conduct that interfered with her work environment.

275. Plaintiff alleges that the conduct included exclusion, undermining of authority, subjective criticism, stereotyped comments, misrepresentation of her work, disability-related disregard, heightened scrutiny, retaliatory conduct, and escalating discipline.

276. Plaintiff alleges that the conduct was based on or related to race, national origin, disability, and protected activity.

277. Plaintiff alleges that the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.

278. Plaintiff alleges that Defendant knew or should have known of the hostile environment because Plaintiff repeatedly reported concerns internally.

279. Plaintiff alleges that Defendant failed to take adequate corrective action.

280. Defendant's conduct violated Title VII and the ADA.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and award the following relief:

A. Declare that Defendant violated Plaintiff's rights under Title VII and the ADA;

B. Award compensatory damages for emotional distress, physical distress, reputational harm, and other injuries;

C. Award all economic damages recoverable under applicable law, including lost compensation, lost employment opportunities, lost promotional opportunities, lost salary increases or merit increases, lost benefits, and any back pay or front pay to the extent supported by the evidence;

D. Order appropriate equitable relief, including correction or removal of improper disciplinary records;

E. Order appropriate relief restoring Plaintiff's employment status, duties, title, classification, supervisory authority, or comparable relief as allowed by law;

F. Award costs, fees, and litigation expenses as allowed by law;

G. Award pre-judgment and post-judgment interest as allowed by law;

H. Grant trial by jury on all triable issues; and

I. Grant all other relief the Court deems just and proper.

VIII. JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

Respectfully submitted,


Dr. Diana C. Awuor
Plaintiff, Pro Se
833 SW 40th Street
Moore, Oklahoma 73160
Phone: (346) 777-8897
Email: awuordiana2020@gmail.com

Date: _July 10, 2026_